## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JANET L. BRENNEMAN, | ) | CASE NO. 3:19 CV 1805 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY J. HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Janet L. Brenneman, ("Plaintiff" or "Brenneman"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying  her

applications  for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States

Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED.

### I.    PROCEDURAL HISTORY

In February 2016, Brenneman filed an application for DIB, alleging a disability onset date of

_____

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

February 12, 2015 and claiming she was disabled due to Post-traumatic Stress Disorder ("PTSD"), Depression and Anxiety. (Transcript ("Tr.") at 234.) The applications were denied initially and upon reconsideration, and Brenneman requested a hearing before an administrative law judge ("ALJ"). (Tr. 115.)

On January 31, 2018, an ALJ held a hearing, during which Brenneman, represented by counsel, and an impartial vocational expert ("VE") testified. (*Id.* at 34.) On June 28, 2018, the ALJ issued a written decision finding Plaintiff was not disabled. (*Id.* at 15-28.) The ALJ's decision became final on June 28, 2019, when the Appeals Council declined further review. (*Id.* at 1.)

On August 8, 2019, Brenneman filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 13, 14.) Brenneman asserts the following assignments of error:

(1)    Whither the Commissioner's Decision supported by substantial evidence on the record taken as a whole and followed correct legal standards. [sic] This is particularly, although not exclusively, with regard to [the ALJ's] failure to discuss the implications of the vocational expert's testimony regarding the amount of time Plaintiff could be off task. It also relates to the improper selection by the ALJ of certain evidence in the medical and personal information on the plaintiff to the exclusion of other evidence on the same or ensuing page in the same exhibit.

(2)    Whether the ALJ's error in stating the Plaintiff's burden of proof at Tr. 26 as "showing ongoing disabling symptoms from doing *any and all work* in the national economy" (italics added) is reversible. The standard is that she be disabled from substantial gainful activity existing in significant numbers in the national economy. Additionally, while the overall burden of proof was Plaintiff's, the burden of showing functional capacity had shifted to the Defendant.

(3)    Even if one assumes that the part of the record to which the ALJ gave great weight (the August, 2017 report of Dr. Querry) is accurate, this report was issued a significant period of time after several contradicting reports and thus the Defendant has not considered all possible 12-month periods. In other

words, the ALJ lumped the records as though it all occurred at a single time and did not discuss the fact that no significant improvement is noted in her condition until at least 30 months after the alleged onset of disability had passed. She also erred in not reviewing a rebuttal report issued with the treatment records because of a purported difference in the standards of disability.

(Doc. No. 12 at 1.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Brenneman was born in January 1971, and was forty-four years old at the time of her alleged disability onset date and forty-seven years old at the time of her hearing, making her a "younger" person under social security regulations. (Tr. 27.) *See* 20 C.F.R. §§ 404.1563 & 416.963. She has at least a high school education and is able to communicate in English. (*Id.*) She has past relevant work as an Assembler Motor Vehicle. (*Id.* at 26.)

### B.  Relevant Medical Evidence[2]

#### 1.  Mental Impairments

Kris Thackery, LCSW, began treating Brenneman on November 7, 2013, shortly after the accident which amputated the tip of her left index finger. (*Id.* at 408.) Initially, Thackery focused on helping Brenneman handle the pain caused by her injury. (*Id.*) However, when Brenneman returned to work in January 2014, the focus of therapy shifted to managing the anxiety and stress caused by her return to work. (*Id.*)

In February 2015, Brenneman's employer asked her to return to work on the machine where she had injured herself, and Thackery noted "she reacted with complete panic." (*Id.* at 409.) As a

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

result, Brenneman was placed on "medical stress leave." (*Id.*)  Thackery noted that Brenneman had also become "distanced from relationships, friends, activities." (*Id.)*  Thackery was concerned "immensely" with Brenneman's mental health, and recommended a "short term psych admission for med management," which Brenneman declined.  (*Id.*)

On February 24, 2015, Brenneman was referred by Thackery for a psychiatric evaluation. (*Id.* at 305.)  She told Psychiatric Nurse Practitioner Tiffany Pottkotter that her primary care physician had prescribed Celexa, which had been effective for the past three years, but after a recent increase in dosage she was feeling "very miserable" with "daily headaches and many GI issues." (*Id.* at 306.) Pottkotter noted that Brenneman had a flat, depressed affect, and hopeless thoughts, but essentially intact and appropriate speech, thought processes and cognition.  (*Id.* at 307.)  She diagnosed major depressive disorder, PTSD, and anxiety disorder NOS, and switched her medication to Zoloft.  (*Id.* at 307-08.)

In March 2015, Thackery saw Brenneman four times, noting "[h]er depression remains severe" and she was "experiencing anxiety in crowded, noisy places like restaurants." (*Id.* at 409-10.)

On April 14, 2015, Brenneman reported to Nurse Pottkotter that she "had some improvement" and described attending a concert with friends, visiting Columbus with her husband and some friends, and attending a meeting at her former workplace. (*Id.* at 327.)  She also expressed a lack of drive or motivation, and an inability to experience joy "like she used to."  (*Id.*)

Thackery's notes from May 2015 through December 2015 describe Brenneman as "having ups and downs," but "[p]rogressing for the positive." (*Id.*)  After a medication change in May 2015, Brenneman told Thackery she had "a great deal of energy and cleaned her house throughly for the

4

1st time in over 6 months," however, "her mood hasn't lifted or changed with this behavioral change." (*Id.* at 410.) Her debilitating mental symptoms were linked to the conviction that she "will and must go back" to her former employer, but "soon thereafter, [she] is paralyzed by the idea." (*Id.* at 411.) In October 2015, Thackery noted that Brenneman "is improving, but maybe not at the pace she hopes for." (*Id.*) However, as the January 2016 deadline for returning to work neared, she was "overwhelmed emotionally" because she "had her mind set on return" but was not able to follow through. (*Id.* at 412.)

On May 29, 2015 and August 8, 2015, Brenneman saw Dr. Margaret Jain for examinations related to her second finger surgery. (*Id.* at 371, 377.) Dr. Jain noted that Brenneman's mood and affect at both visits were normal. (*Id.* at 373, 382.)

Notes from Nurse Pottkotter also indicate progress during this period. At Brenneman's May 2015 appointment, she reported her nightmares "have pretty much subsided." (*Id.* at 325.) On October 16, 2015, Brenneman reported that she "has had some good days, feels like she may be 'living' a bit more and not isolating as much." (*Id.* at 320.) On November 20, 2015, she told Pottkotter that an increase in Wellbutrin had "really helped, she noted a difference in her depression and anxiety had improved." (*Id.* at 318.) However, when Pottkotter saw her on January 6, 2016, the day before her scheduled return to work date, her anxiety had increased, nightmares had returned, and she felt "really messed up in the head." (*Id.* at 315.)

In January 2016, Thackery noted that Brenneman's affect and mood had improved once she had decided not to return to her former employer. (*Id.*)

On March 14, 2016, David S. Doane, Ph.D., evaluated Brenneman at the request of the Workers' Compensation office. (*Id.* at 415-19.) During her mental status exam, he noted a "sad and

5

anxious" demeanor, indications of low self-worth, anxiety, and panic disorder, and difficulties with memory and concentration. (*Id.* at 418.) However, he described her as cooperative, alert and oriented, attentive and able to give relevant answers to his questions "without rambling." (*Id.*) He opined that Brenneman had panic disorder with agoraphobia, anxiety disorder NOS, and major depressive disorder, single episode, unspecified. (*Id.* at 419.) He disagreed with the PTSD diagnosis, however. (*Id.*) He described her psychosocial stressors as "severe" and noted they included "sensitivity and discomfort in the left index finger; . . . unemployment, financial strain; her mother's death; and diminished social support." (*Id.*)

On March 16, 2016, Thackery noted that Brenneman had fallen into a "depression/anxiety cycle" due to the "resurgence of appointments, Worker's Comp, Ford, SSDI, attorneys, etc." associated with her decision to leave her former employer. (*Id.* at 413.)

On March 28, 2016, Nurse Pottkotter wrote a letter to document the basis for her diagnosis of PTSD, which was co-signed by Dr. Ryan J. Travis, a psychiatrist. (*Id.* at 534-35.)

On March 30, 2016, Thackery filled out a Daily Activities Questionnaire regarding Brenneman's functioning. She noted that she saw Brenneman twice a week for cognitive behavioral therapy, and that Brenneman was "very reliable" and "completely compliant." (*Id.* at 407.) She opined that Brenneman had no behaviors or deficits that prevented her from living independently, and had normal abilities to care for her own needs in food preparation, personal hygiene, driving, banking and bill paying. (*Id.* at 406-07.) However, Thackery believed Brenneman was unable to return to her former job because she "has a panic attack when she arrives at the area of her workplace," and was "anxious in the work environment to the point of debilitation." (*Id.* at 406.)

On March 31, 2106, Brenneman told Nurse Pottkotter she was "not doing well, going

6

backwards." (*Id.* at 309.)  Her nightmares had resumed, and her husband reported she was "shaking in the night." (*Id.*)  Nurse Pottkotter noted a depressed, tearful affect and preoccupied thoughts, but essentially intact and appropriate speech, thought processes, thought content, insight, judgment and cognition. (*Id.* at 310.)

On January 26, 2017, Gordon Harris, Ph.D. conducted a second independent medical examination to assess Brenneman's disability claim for her former employer. (*Id.* at 541-47.)  He opined that Brenneman could not return to her former workplace, because her PTSD "causes her great distress and does not allow her to be in the environment in which she was injured or around related stimuli." (*Id.* at 547.)  He also opined that she was "socially withdrawn and exhibits deficits in attention and concentration. (*Id.*)  He stated she had not reached maximum medical improvement, and predicted that medication adjustment and ongoing psychotherapy might provide her with further relief. (*Id.*)

On June 29, 2017, Brenneman's new therapist, Jennifer Arlington, LPCC, completed a Treatment Summary indicating that Brenneman had "marked" limitations in her activities of daily living; social functioning; concentration, persistence, and pace; and adaptation. (*Id.* at 576.)

On August 31, 2017, Brenneman was evaluated by a third independent psychiatrist, Mark Querry, Ph.D. (*Id.* at 548-58.)  Dr. Querry administered the Beck Depression Inventory, second edition, and she scored 30, indicating a "severe" depressive state, which he opined was 'consistent with her mental status examination. (*Id.* at 554.)  He also administered the Beck Anxiety Index, second edition, and she scored 25, indicating a "moderate" level of anxiety, but Dr. Harris noted that the test questions reflected symptoms of a panic disorder rather than PTSD. (*Id.* at 555.)  He opined that Brenneman was "capable of remunerative employment," but not capable of returning to her

former workplace, "since merely the site [sic] of the plant appears to trigger her PTSD symptoms." (*Id.* at 558.) He also opined that her PTSD had reached "maximum medical improvement," although she should "consult a qualified mental health professional about the appropriateness of continuing her psychotropic medication for purposed of maintenance." (*Id.* at 558.)

On October 18, 2017, Arlington and William S. Frolian, Ph.D., wrote a letter in response to Dr. Querry's report. (*Id.* at 579-80.) They "adamantly" disagreed with his conclusions that Brenneman had reached maximum medical improvement and should not be allowed any additional psychotherapy treatment. (*Id.* at 579.) They opined that she had made "ongoing and consistent improvements in psychological functioning since beginning psychotherapy treatment" but "continues to experience temporarily [sic] and totally disabling symptoms of Posttraumatic Stress Disorder to the present time." (*Id.* at 579-80.) They noted Brenneman reported symptoms that would "significantly impact her ability to function in a workplace to meet the demands and keep up with a pace that an employer would expect of her," including difficulty sleeping, constant fatigue, frequent nightmares, hypervigilence, flashbacks and intrusive memories, depressed mood, and difficulties with focus, concentration, and memory. (*Id.* at 580.) They opined she was not yet ready to participate in a vocational rehabilitation program or return to work, but ongoing psychotherapy could further improve her psychological functioning. (*Id.*)

On October 18, 2017, Arlington also completed a second Treatment Summary, indicating that Brenneman now had only "moderate" limitations in her activities of daily living, social functioning and adaptation, although she still had "marked" limitations in concentration, persistence, and pace. (*Id.* at 584.)

On December 13, 2017 and January 17, 2018, Arlington completed additional Treatment

8

Summaries, indicating the same limitations as the October 18 Summary. (*Id.* at 590.)

On December 28, 2017, Dr. Frolian completed a Physician's Report of Work Ability for the Ohio Bureau of Workers' Compensation indicating that Brenneman was able to "pursue vocational rehabilitation with: gradual introduction to job duties; rest periods as needed; avoidance of stimuli that triggers anxiety; allowances for medical restrictions; minimal interaction with public." (*Id.* at 591-92.)

### 2.    Physical Impairments[3]

On November 1, 2013, the tip of Brenneman's left index finger was cut off in a workplace accident. (*Id.* at 360.) She underwent an amputation, but after healing, continued to experience pain and severe sensitivity at the tip of that finger. (*Id.* at 363.)

On November 11, 2014, Dr. Margaret Jain performed a second surgery to remove two neuroma from the tip of Brenneman's left index finger. (*Id.* at 363.)

### C.    State Agency Reports - Mental Impairments

On April 15, 2016, state agency reviewing psychologist Paul Tangerman, Ph.D., opined that Brenneman had moderate limitations to the following abilities:

•        understand and remember detailed instructions;

•        carry out detailed instructions;

•        maintain attention and concentration for extended periods;

---

[3] Brenneman's finger injury is relevant to the assignments of error raised in this appeal only in that it is the traumatic incident that caused her PTSD.  Neither party sets forth detailed medical evidence in their briefs, and the Plaintiff acknowledges "the physical findings of the ALJ are . . . not in dispute." (Doc. No. 12 at 3.)  Therefore, only the bare facts of her injury are recited here, and the state agency reviewers' opinions will not be discussed.

9

- work in coordination with or proximity to others without being distracted;

- complete a normal workday and workweek without interruption from psychologically-based symptoms;

- interact appropriately with the general public;

- get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- respond appropriately to changes in the work setting; and

- set realistic goals or make plans independently.

(*Id.* at 71-74.)

On August 17, 2016, state agency reviewing psychologist Aracelis Rivera, Psy.D., concurred with Dr. Tangerman's findings. (*Id.* at 89-91.)

**D.    Hearing Testimony**

During the January 31, 2018 hearing, Brenneman testified to the following:

- She was born in January 1971. (*Id.* at 41.)

- She has lived at the same address for 17 years. She currently lives with her husband and 17-year-old daughter. (*Id.*)

- She is right-handed. (*Id.*)

- She completed high school, but has done no college course work or earned any vocational certificates. (*Id.* at 41-42.)

- She last worked for Ford Motor Company as an assembler. Her last day of work was February 12, 2015. Any payments she received from Ford after that time were dividends paid for profit-sharing or long term disability. (*Id.* at 42.)

- As of November, she no longer receives Worker's Compensation, and currently has no income. (*Id.*)

- At Ford, she assembled engine parts. The weight of the parts varied, but was not greater than fifteen or twenty pounds. (*Id.* at 43.)

- Prior to working at Ford, Brenneman worked as a landscaper, pulling weeds and planting flowers for a retired man.  She worked four or five hours a day, but not every day, and was paid about $10 an hour.  (*Id.* at 43-44.)

- Her employment at Ford has been terminated, and she has not applied for any other work.  (*Id.* at 44.)

- She does not think she is capable of working "right now" because she has "really bad social anxiety. And . . . a lot of problems with concentration and . . . memory." (*Id.* at 44-45.)

- She has a hard time sleeping, and suffers from nightmares, so she typically sleeps throughout the day. She does small tasks like laundry and sweeping at her own pace. Her daughter helps with cooking.  She can bathe herself.  On a weekly basis, she will have days when she feels overwhelmed and just shuts down and doesn't do anything.  (*Id.* at 45.)

- She still has pain in her left index finger.  The pain is severe when she puts direct pressure on the end of the finger.  Typing is very difficult for her.  Even picking up a coffee cup with her left hand causes "some issues."  She can carry a laundry basket because she can guard her finger and not use it.  (*Id.* at 45-46.)

- She does not have "any other physical problems" besides her left hand.  (*Id.* at 46.)

- She goes to counseling for her mental issues.  She was attending counseling every two weeks, until workman's comp cut her back to going once a month.  She feels that the decrease in therapy led to an increase in her emotional symptoms.  (*Id.*)

- She currently takes Zoloft, Wellbutrin, Xanax, and Ambien.  (*Id.* at 47.)

- Ambien is helpful with her sleep problems, but her psychiatrist told her not to take it every night, and "try to go as long as I could without it."  She takes it about twice a week.  (*Id.*)

- Xanax is prescribed "as needed," and sometimes she will take it as often as twice a day, but other times she might take it once a week.  (*Id.*)

- Her psychiatrist, Dr. Rhee, was working on lowering her dosage of Xanax and Ambien before he retired.  She has refills of the medications that will last until February, but doesn't have a current treating psychiatrist because she has had a hard time finding someone who will work with Worker's Compensations.  (*Id.* at 47-48.)

11

- She last saw Dr. Rhee in September.  (*Id.* at 48.)

- She gets out of the house about three days a week, but some weeks she doesn't go out at all.  It depends on her anxiety "and just how I'm feeling that day." (*Id.* at 49.)

- Her anxiety is triggered by crowds.  (*Id.*)

- When she has a panic attack, her heart starts racing, she has trouble breathing, she feels overwhelmed, and it "almost feels like you could pass out."  (*Id.*)

- She has panic attacks in situations not involving crowds, too, including when she is at home.  She "can have panic attacks everyday."  (*Id.*)

- When she has a panic attack, she will "just try to breathe deeper."  (*Id.*)

- She goes grocery shopping on a regular basis.  Her farther usually goes with her.  Sometimes she is accompanied by her husband or her daughter.  She never goes alone, "because I don't think I could make it out of the car by myself."  (*Id.* at 49-50.)

- At the beginning, her father drove her to doctor's appointment, but over the last four months she has been able to drive herself "because everything was right here." (*Id.* at 50.)

- Her daughter is in high school.  She is studying cosmetology.  She isn't involved in any other school activities.  (*Id.*)

- Last June, Brenneman and her husband and daughter drove down to Hampton, Virginia to visit her stepdaughter and the stepdaughter's husband.  She and her husband stayed at their house for a weekend, and did not go out to eat.  (*Id.* at 50-51.)

- For entertainment, she watches tv with her husband in the evenings.  She also works on puzzles because her therapist said they would help her concentration and memory.  She can finish a puzzle, and finds "it can clear my mind."  (*Id.* at 51.)

- She used to enjoy reading, but now has a hard time getting past the first page, because "I have a hard time concentrating on what I'm reading and understanding it."  (*Id.* at 52.)

- She goes out to eat "maybe once a month, if that."  (*Id.* at 53.)

- She had a panic attack at home once when her daughter stayed up later than her

parents one night, and she awoke to find her daughter hadn't picked up her mess. Her anxiety started rising, "I shake inside" and she felt so overwhelmed that "I can just drop everything and just go back to bed and wish the day away." (*Id.*)

• Her daughter helps her cook because she doesn't always remember what ingredients she put in, "and it becomes very frustrating." She has needed this help since February 2015. (*Id.*)

• She has trouble picking up small objects with her left hand, but she can handle larger ones. (*Id.* at 54.)

• Before her injury, she liked to go shopping and go out with friends. Now she doesn't do that. (*Id.*)

• Sometimes one or two friends come to visit her. (*Id.*)

The VE testified Brenneman had past work as an "assembler, motor vehicle." (*Id.* at 56.)

The ALJ then posed the following hypothetical question:

For my first hypothetical, I would like you to assume an individual of the claimant's age, education and vocational background with the ability to perform a full range of work at the medium exertion level, except no exposure to vibration.

The individual is limited to simple tasks that are not fast pace[d], meaning the pace of productivity is not directed by an external source over which the individual has no control; only occasional interaction with co-workers and supervisors; no interaction with the public; and the individual is limited to a work routine that is repetitive from day-to-day with few and expected changes.

Would such an individual be capable of performing claimant's past work?

(*Id.* at 56-57.)

The VE testified the hypothetical individual would not be able to perform Brenneman's past work as motor vehicle assembler. (*Id.* at 57.) The VE further explained the hypothetical individual would be able to perform other representative jobs in the economy, such as equipment cleaner, laboratory; factory helper/inspector; and sorter. (*Id.*)

The ALJ then posed a second hypothetical question:

13

For my second hypothetical, please assume all the same limitations as the previous hypothetical, but further reduce the individual to work at the light exertional level, and add that the individual can only occasionally handle, finger and feel with the left upper extremity.

Would there be jobs at the light exertional level such an individual could perform?

(*Id.* at 57-58.)

The VE testified there would not be jobs available.  (*Id.* at 58.)

Next, the ALJ asked if there would be jobs available at the sedentary exertional level that the hypothetical individual could perform.  (*Id.*)  The VE testified there would not be jobs available.  (*Id.*)

The VE also testified that, in her experience, off-task behavior was acceptable up to fifteen percent of the workday, and absences were tolerated at once occurrence or less per month, for an annual rate of ten to twelve absences in competitive employment.  (*Id.*)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of

14

a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Here, Brenneman was insured on her alleged disability onset date, February 12, 2015, and remains insured through June 30, 2021, her date last insured ("DLI"). (Tr. at 17-18.) Therefore, in order to be entitled to POD and DIB, Brenneman must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry*

15

*v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2021.

2.      The claimant has not engaged in substantial gainful activity since February 12, 2015, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.      The claimant has the following severe impairments: traumatic amputation of left index finger with neuroma of amputation stump; major depressive disorder; anxiety disorder; panic disorder with agoraphobia; and post-traumatic stress disorder (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except: she can have no exposure to vibration. She is limited to simple tasks that are not fast-paced, meaning the pace of productivity is not dictated by an external source, over which she has no control.  She can occasionally interact with coworkers and supervisors, but she can have no interaction with the public.  She is limited to a work routine that is repetitive from day-to-day with few and expected changes.

6.      The claimant is unable to perform any past relevant work.

7.      The claimant was born on January **, 1971, and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can performs (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 12, 2015, through the date of this decision (20 CFR 404.15209g)).

(Tr. 17-28.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v.*

17

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied.  Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No.

18

1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

**A.      First Assignment of Error: The Commissioner's decision is not supported by substantial evidence on the record taken as a whole.**

Brenneman asserts that the ALJ failed to support her Decision by substantial evidence, as required by law, because she "cherry picked" evidence that supported her finding, and improperly overlooked evidence indicative of disability, especially in the area of concentration. (Doc. No. 12 at 9-12.) She alleges that the ALJ improperly excluded record evidence showing that Brenneman had clinical deficits in memory, including a report by Dr. Doane which included a clinical finding of impairment in this area, a report by Dr. Harris that Brenneman showed impairment in attention and concentration, and self-reports that Brenneman needed a reminder set on her phone to take her medication, and had become forgetful in regards to her financial responsibilities. (*Id.* at 1, 10-11.) She also argues that it was error for the ALJ not to directly address the VE's testimony that, in her experience, off-task behavior that occurred more than fifteen percent of the workday precluded competitive employment. (Doc. No. 14 at 3.)

The Commissioner responds that the ALJ reasonably considered the evidence of record, including evidence relating to her concentration and attention, and created an RFC finding that accommodated Brenneman's functional limitations.[4] (Doc. No. 13 at 8.) He notes that "the ALJ considered that the mental treatment records generally showed progressive improvement," and that

---

[4] The Commissioner also argues that Brenneman waived her argument regarding the RFC by failing to develop it. (Doc. No. 13 at 8 n.4.) However, although her initial brief (Doc. No. 12) failed to connect her argument regarding "cherry picking" to the RFC finding, the Reply (Doc. No. 14) helped clarify her intent, and the Court will address it here.

19

Nurse Pottkotter's 2015-2016 mental status reports "generally showed Plaintiff as having intact cognition, thought process, and thought content." (*Id.* at 9.)  He asserts that this, combined with the August 2017 report of Dr. Querry, and the findings of the state agency reviewing psychologists, constituted substantial evidence supporting the ALJ's Decision.  (*Id.*)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2).[5] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96  8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [. . .] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96  8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment

---

[5] This regulation has been superseded for claims filed on or after March 27, 2017.  As Brenneman's application was filed in March 2016, this Court applies the rules and regulations in effect at that time.

conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  It is also well established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin,* No. 1:10  cv  734, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (accord).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that place a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany  Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474 at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11  CV  2313, 2013 WL 943874 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

21

Here, at step two, the ALJ determined Brenneman suffered from the severe impairments of traumatic amputation of left index finger with neuroma of amputation stump, major depressive disorder, anxiety disorder, panic disorder with agoraphobia, and post-traumatic stress disorder. (Tr. 18.) Although the ALJ acknowledged her history of obesity, she found that this was not a severe impairment. (*Id.*)

At step four, the ALJ determined that Brenneman has a "moderate" limitation in "understanding, remembering, or applying information," based on the following evidence:

> During the hearing, the claimant testified that her daughter helps her cook because she keeps forgetting her ingredients. In her Function Report, the claimant stated that she needs reminders to take her medication (Exhibit 5E/4). During a mental status examination on March 4, 2016, the claimant recalled two of four words after a five-minute latency and on a serial sevens task, she subtracted by sevens beginning at 100 and slowly went back correctly two places, erred, and stopped after a long break (Exhibit 8F/4). Jennifer Arlington, LPCC, her therapist, noted that the claimant has "deficits in memory." (Exhibits 13F/9; 14F/9). However, these observations are based on the claimant's self-reports rather than objective medical examinations (Exhibits 13F/9; 14F/9). Moreover, the claimant also reported that she does not need reminders to take care of personal needs and go places (Exhibit 5E/4, 6). On March 4, 2016, she was able to correctly and slowly spelled [sic] a five-letter word forward and backward and on a serial threes task, she subtracted threes beginning at 20 and went back six places without error (Exhibit 8F/4). Further, on April 21, 2017, Mark Querry, Ph.D. found upon examination, the claimant's "immediate, recent and remote memory functions were grossly intact" (Exhibit 12F/5).

(*Id.* at 19.) The ALJ also found that Brenneman has a "moderate limitation with regard to concentrating, persisting, or maintaining pace." (*Id.*)

In making her determination of Brenneman's RFC, the ALJ referenced many of the records she had cited in her step four analysis, especially the report of independent examiner Dr. Querry, as well as numerous mental status reports that described Brenneman's "thought process and content, insight and judgment, and cognition as 'essentially intact and appropriate.'" (*Id.* at 24.) She also

22

looked to Brenneman's activities of daily living discussed at step four, noting that, "She takes her daughter to school and picks her up in the afternoon.  She testified that she does laundry and sweeps at her own pace.  She indicates that she cooks with the assistance of her daughter.  Such wide-ranging activities are clearly inconsistent with the degree of symptoms and limitations that she has alleged."  (*Id.*)

Brenneman points out other evidence in the record that she alleges the ALJ overlooked or omitted.  For example, in his report on Brenneam's March 2016[6] mental status examination, independent examiner Dr. Doane opined that "[d]ifficulties in memory and concentration were indicated."  (Doc. No. 12 at 10, *citing* Tr. 418.)  However, this is consistent with the ALJ's finding of "moderate limitation" with regard to concentrating and remembering information.  (Tr. 19.)  Brenneman undermines her own argument regarding "cherry picking" by devoting nearly a page of her Brief to asserting that the ALJ omitted key findings of Dr. Doane's report which she had directly quoted only a few pages earlier in her Decision.  A significant portion of the evidence that Brenneman alleges the ALJ omitted - that Brenneman "recalled two of four words after a five-minute latency and on a serial sevens task, she subtracted by sevens beginning at 100 and slowly went back correctly two places, erred, and stopped after a long break" - is specifically described in the step four evaluation and forms part of the basis for the ALJ's finding that Brenneman had a moderate limitation in the area of memory.  (*Id.*; Tr. 19.)

The ALJ did acknowledge Brenneman had some limitation in the areas of memory and concentration.  Brenneman disagrees with the ALJ about the extent of this limitation, not its

---

[6]  The ALJ's Decision discussed this examination in her step four analysis, and identifies it as "a mental status examination on March 4, 2016."  (Tr. 19.)  However, the report in the record states that the date of the examination was March 14, 2016.  (*Id.* at 415.)

existence. The ALJ incorporated mental limitations into her RFC reflecting these impairments, including that Brenneman "is limited to simple tasks that are not fast-paced, meaning the pace of productivity is not dictated by an external source, over which she has no control. . . . She is limited to a work routine that is repetitive from day-to-day with few and expected changes." (Tr. 21.) Both Brenneman and the ALJ cite evidence suggesting that her impairments in memory and concentration may be more than moderately severe, but where, as here, there is contradictory evidence, it is the role of the ALJ to resolve those contradictions, and the Court cannot reverse her decision simply because a reasonable fact-finder might draw a different conclusion. *See, e.g., Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")

Brenneman places great emphasis on the fact that the ALJ did not directly address off-task behavior in her Decision. (Doc. No. 12 at 10-11.) However, she cites no medical evidence that states the need for this type of limitation. The only place off-task behavior is addressed in the record evidence cited by the parties is at the hearing, where the ALJ asked the VE the following question: "What is the tolerance for off-task behavior in competitive employment?" (Tr. 58.) The VE testified that off-task behavior for more than fifteen percent of an eight-hour work day would preclude competitive employment. (*Id.*) Brenneman asserts that the ALJ erred by failing to explain in her Decision why she felt that Brenneman did not exceed that fifteen percent threshold for off-task behavior. (Doc. No. 12 at 10-11.) However, Brenneman cites no evidence that directly bears on the issue of off-task behavior, relying instead on the evidence relating to memory and concentration discussed *supra*. (*Id.*) While it may have been helpful for the ALJ to address this issue directly, she

is not required to discuss every possible limitation, and it is reasonable to conclude, based on her RFC, that she believed Brenneman would be off-task less than fifteen percent of an eight-hour work day, and therefore omitted this limitation from her RFC.

As Brenneman acknowledged in her Reply, the RFC is focused on the claimant's functional abilities, rather than her limitations. (Doc. No. 14 at 2*.*) *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002) ("While we acknowledge that [a claimant's] maladies should inform an assessment of her abilities, this does not mean that the RFC must enumerate them.")  Thus, it is reasonable that, in the section of the Decision explaining the RFC determination, the ALJ focused on evidence showing Brenneman's abilities.  Evidence is not omitted or distorted when it is discussed in another section of the Decision, and, in this case, the ALJ focused on evidence demonstrating Brenneman's limitations in her step four analysis.  While Brenneman does cite some evidence that the ALJ does not discuss in her Decision, both parties acknowledges that the law does not require the ALJ to discuss every piece of evidence in the nearly 600-page record.  (Doc. No. 13 at 12; Doc. No. 14 at 4.)

At its core, Brenneman's argument is that the ALJ should have interpreted the evidence differently.  However, Sixth Circuit law is clear: "as long as substantial evidence supports the Commissioner's decision, we must defer to it, 'even if substantial evidence in the record would have supported an opposite conclusion.'"  *Warner v.Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004), *quoting Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  Therefore, the undesigned does not recommend remand based on the first assignment of error.

**B.**       **Second Assignment of Error: The Legal Standard Asserted by the ALJ was Improper.**

Brenneman next asserts that the ALJ relied on an incorrect legal standard in her finding of

disability.  (Doc. No. 12 at 12-13.)  She points out that, in the section of her Decision that sets forth the basis for her determination of RFC, the ALJ states "the claimant has not satisfied the burden of showing ongoing disabling symptoms that would prevent her from doing any and all work in the national economy."  (*Id.* at 12, *quoting* Tr. 26.)  Brenneman acknowledges that the ALJ articulated the correct standard in her tenth finding: "Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform."  (*Id.* at 13, *quoting* Tr. 27.)  However, Brenneman argues the earlier mis-statement is not a harmless error because it was made in the context of weighing the reports of the independent examiners who evaluated her functioning for her Worker's Compensation claim, which she alleges were overlooked, ignored or cherry-picked, as discussed *supra.* (*Id.*)  Brenneman argues that this mis-statement reveals the ALJ's underlying rationale for her decision, and therefore constitutes reversible error.  (*Id.*)

The Commissioner did not respond directly to this argument.

The correct standard for the fifth step of the disability analysis is that, even if the claimant's impairment does prevent him or her from doing his past relevant work, if other work exists in significant numbers in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

Although the Court agrees that the first sentence quoted by Brenneman mis-states the standard for the finding of disability, the correct standard is stated and applied in the appropriate section of the decision.  Moreover, as discussed *supra*, the ALJ did not omit or ignore evidence of mental impairment in the report of Dr. Doane.  While she did not discuss the third independent examiner's report in the same depth, she explained her decision to give all three Worker's

Compensation evaluations "little weight" with the accurate statement that all the Worker's Compensation evaluations had "different evaluation guidelines and different standards." (Tr. 26.) This assignment of error re-hashes the cherry-picking allegations, and does not offer any other basis for inferring that the ALJ actually applied an erroneous standard to the determination of whether jobs exist in significant numbers in the national economy that the Brenneman can perform. Therfore, the undersigned recommends that the ALJ's mis-statement be viewed as harmless error, and not a basis for remand.

C.     **Third Assignment of Error: The Failure of the ALJ to Consider All Twelve-Month Periods and Discounting the Report of the Treating Therapist for Incorrect Reasons Constitutes Reversible Error.**

Brenneman's final assertion is that the ALJ erred by basing her determination of RFC on opinion of Dr. Querry, the third independent examiner, "without consideration for the fact that it was issued [in August 2017] more than two years after the alleged onset date and stands for nothing other than a residual functional capacity as of the date of the examination." (Doc. No. 12 at 14.) She acknowledges that Dr. Querry's report supports the ALJ's RFC determination, but asserts that, in the seventeen month between her alleged onset date and Dr. Querry's report, "no professional who saw or examined Plaintiff . . . supports the findings of the capacity to do the work found." (*Id.*) She also notes that the previous two independent examiners had opined that Brenneman had not reached maximum medical improvement, indicating that her situation was not static, and that, even after Dr. Querry's report, Brenneman's therapist, Jennifer Arlington, LPCC, documented in her clinical notes that Brenneman was experiencing symptoms that interfered with her daily functioning. (*Id.* at 15.)

The Commissioner responds that this assertion of error is simply a rehashing of Brenneman's earlier complaints, including that she had greater concentration deficits than assessed

27

by the ALJ and that the ALJ should have weighed the evidence differently. (Doc. No. 13 at 14.) He points out that Brenneman's argument attempts to shift the burden of proof in establishing disability to the ALJ, and that Brenneman cites no legal authority for the proposition that a medical opinion cannot be considered for any point prior to the date of that opinion. (*Id.*) Finally, he asserts that the ALJ did not rely on any single piece of evidence in making the RFC determination, but rather properly considered the evidence of the record as a whole. (*Id.* at 14-15.)

Brenneman's argument again hinges on the incorrect assertion that the ALJ omitted evidence of impairment in the other two independent examiner's reports. As discussed *supra*, the ALJ did cite relevant details from all three reports: the March 2016 report of Dr. Doane, the January 2017 report of Dr. Harris, and the August 2017 report of Dr. Querry. (Tr. 19-20; 23-24.) Brenneman's statement that no other professional who saw or examined Brenneman expressed an opinion that could be perceived as supporting the finding of RFC is also inaccurate. One example included in Brenneman's recitation of the facts is the March 30, 2016, Daily Activities Questionnaire completed by her first therapist, Kris Thackery, LCSW, who described Brenneman as "very reliable" and "completely compliant." (*Id.* at 407.) Thackery opined that Brenneman had no behaviors or deficits that prevented her from living independently, and had normal abilities to care for her own needs in food preparation, personal hygiene, driving, banking and bill paying, and needed no assistance in any of these areas. (*Id.* at 406-07.) The primary limitation perceived by Thackery was that Brenneman was unable to return to her former job because she "has a panic attack when she arrives at the area of her workplace," and was "anxious in the work environment to the point of debilitation." (*Id.* at 406.) She did not suggest that Brenneman was unable to engage in work; rather she opined that Brenneman must work at a different location and in a different work environment

than her former job.  (*Id.*)

There is considerable evidence[7] that Brenneman's condition fluctuated during the period at issue in this case, but that fluctuation does not make it easier to meet her burden of demonstrating an inability to work "which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).  Indeed, the evident fluctuation makes it more challenging for Brenneman to show that she was consistently disabled for a continuous twelve-month period, and the ALJ had substantial evidence to conclude Brenneman did not meet this burden.

For all the reasons set forth above, the undersigned believes that the ALJ has met the burden of supporting her conclusions with substantial evidence and they are therefore entitled to deference from the Court.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: February 10, 2020

---

[7]  This evidence included the treatment summaries completed by her second therapist, Jennifer Arlington, which Brenneman discusses.  (Doc. No. 12 at 15.)

29

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).